IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 6, 2023 Session

**STATE OF TENNESSEE v. WILLIE LOCUST**

**Appeal from the Circuit Court for Dyer County**
**No. 20-CR-29      Mark L. Hayes, Judge[1]**

_____

**No. W2022-01026-CCA-R3-CD**
_____

Defendant, Willie Locust, was convicted after a bench trial in Count 1 of possession of more than 0.5 grams of cocaine with the intent to sell or deliver, a Class B felony; in Count 2 of possession of more than 0.5 grams of methamphetamine with the intent to sell or deliver, a Class B felony; in Count 3 of simple possession of Xanax, a Class A misdemeanor; in Count 8 of unlawful possession of brass knuckles, a Class A misdemeanor; in Count 9 of possession of a firearm during the commission of a dangerous felony, a Class D felony; and in Count 10 of possession of a firearm by a convicted violent felon, a Class B felony. For these convictions, Defendant was sentenced to an effective twenty-eight years in confinement. On appeal, Defendant argues that (1) the trial court erred by denying his pretrial motions to suppress the evidence obtained from a search of his hotel room; (2) the evidence was insufficient to support his convictions; and (3) the trial court erred by ordering partial consecutive service of his sentences. After a thorough review of the record, we affirm the judgments of the trial court. However, because the trial court erroneously merged Counts 9 and 10, we order the trial court to reinstate the judgment in Count 9 and to impose a sentence on that count. We also remand for correction of a clerical error in the judgment in Count 3 to show the conviction offense as Tennessee Code Annotated section 39-17-418 rather than section 39-17-417.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Case Remanded for Entry of Corrected Judgments**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Patrick Frogge, Executive Director, Tennessee District Public Defender's Conference; Brennan M. Wingerter (at oral argument and in reply and supplemental briefs), Appellate

---

[1] We note that the Honorable Judge R. Lee Moore presided over this case until his retirement in December 2021, and that he heard and decided Defendant's motions to suppress. Judge Hayes presided over Defendant's trial and subsequent proceedings.

Director; and Brian D. Wilson (on appeal), Assistant Public Defender, Appellate Division; James E. Lanier, District Public Defender; and H. Tod Taylor (at trial), Assistant District Public Defender, for the appellant, Willie Locust.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry (at oral argument and in supplemental brief) and Jonathan H. Wardle (on appeal), Senior Assistant Attorneys General; Danny Goodman, Jr., District Attorney General; Karen W. Burns, Chief Deputy District Attorney General; and Tim Boxx, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises from the Dyersburg Police Department's receiving an anonymous Crime Stoppers tip on December 20, 2019, that Defendant was selling heroin and methamphetamine from Room 45 at the Sunrise Inn in Dyersburg. The same day, the police conducted a "knock and talk" conversation at Room 45, during which Gary Greenwood, who had answered the door, asserted that he had purchased methamphetamine from Defendant in Room 45 multiple times over the past month and that he had seen marijuana and scales in the room that day. The police subsequently obtained a search warrant, and the search yielded a quantity of drugs, a set of brass knuckles, and a handgun.

In February 2020, the Dyer County Grand Jury indicted Defendant for possession of more than 0.5 grams of cocaine with the intent to sell or deliver; possession of more than 0.5 grams of methamphetamine with the intent to sell or deliver; possession of Xanax with the intent to sell or deliver; possession of methadone with the intent to sell or deliver; simple possession of marijuana; possession of naloxone; possession of hydrocodone with the intent to sell or deliver; unlawful possession of brass knuckles; possession of a firearm during the commission of a dangerous felony; and possession of firearm by a convicted violent felon. *See* Tenn. Code Ann. §§ 39-17-408, -415, -417, -418, -434, -1307, -1324 (2019). Defendant subsequently filed two pretrial motions to suppress the evidence obtained during the search of his hotel room.

a. First motion to suppress

In the first motion, Defendant argued that the police had no evidence to confirm the nature of the Crime Stoppers informant or evidence to corroborate the tip; that Mr. Greenwood was a criminal informant whose veracity was unknown by the police; and that Mr. Greenwood's statement against his penal interest was unrelated to any crimes occurring in Room 45 that day, only prior crimes. In addition, Defendant asserted that aspects of the search warrant affidavit were false statements recklessly made. Specifically,

- 2 -

he stated that Dyersburg Police Officer Jesse McNeil enhanced the Crime Stoppers informant's credibility by characterizing them as a citizen informant who had asked to remain anonymous. Likewise, Defendant argued that the amount of cash Officer McNeil found on Defendant's person was not as significant as he asserted in the affidavit.

A copy of the search warrant was attached to the motion. In the affidavit to the search warrant, Officer McNeil stated that he had been a police officer for five years and had been assigned to the Street Crimes Unit of the Dyersburg Police Department for four months. He stated, in relevant part, that he had more than 150 hours of training in narcotics and narcotics investigations; that he had participated in the preparation and service of several search warrants at the state and federal level; that he had worked with "confidential informant[s] and citizen informants," leading to several arrests and convictions; and that he had talked to drug dealers and people arrested for selling drugs about "how they conduct their drug sales, what they use to sell drugs, and where they keep their evidence of drug sales." Officer McNeil also wrote that, in his training and experience, drug sellers maintained large amounts of cash in order to finance their drug businesses and possessed firearms and other "dangerous weapons" to protect themselves, their profits, and their drug supply. Relative to the facts of the case, Officer McNeil wrote the following:

On December 20, 2019[,] I responded to a drug complaint at 1170 Highway 51 Bypass South, Sunrise Inn room 45. The complainant, a citizen informant that wishes to remain anonymous advised "Tail Light" (also known to officers as [Defendant]) is selling large amounts of heroin and "ice" (methamphetamine) out of the room. The citizen informant called Crime Stoppers with the information. The description given to officers about "Tail Light" was an older black male, bald head, about 5'10["] and 170 pounds. Officers arrived at 1170 Highway 51 South, Sunrise Inn room 45, and made contact with [Defendant] AKA "Tail Light[.]" Gary D. Greenwood was also found inside the room. Both subjects were asked to come out of room 45 and engage in conversation with [O]fficer Wheeler and I. I spoke with [Defendant] and asked to search his pockets. [Defendant] appeared to have a considerable amount of US Currency in his wallet. During the consensual encounter Gary Greenwood did provide your affiant with the following information: Greenwood said two weeks ago he had purchased $20 worth of illegal narcotics from [Defendant] at room 45. Gary Greenwood continued to engage in conversation with Officer Brandon Wheeler outside the hotel room. Greenwood told Officer Wheeler that when police made contact with them at room 45, a digital scale was on the table where he and [Defendant] were sitting. Greenwood stated that the scale was being used by [Defendant] to weigh illegal narcotics for resale. Greenwood said that he had observed approximately 2 to 3 grams of marijuana inside the hotel room today. Greenwood stated he purchased approximately 1 gram of methamphetamine

from [Defendant] out of room 45 in the past week. Greenwood stated he has consistently purchased marijuana and methamphetamine from [Defendant] out of room 45 in the past month. Greenwood said when he does purchase illegal narcotics from [Defendant]; he only purchases $20 worth at a time. A routine warrants check of Greenwood showed him to have active warrants out of California for possession of dangerous drugs. California will not extradite for the pending charges they have against Greenwood.

The warrant itself contained a line reading, "ISSUED ON 12-20-19 at 6:06 p.m. to Ofe. Jesse McNeil." The date, time, and Officer McNeil's name were handwritten, and underneath the space containing Officer McNeil's name, "AFFIANT" was typed.

Officer McNeil testified at the suppression hearing that, on December 20, 2019, he responded to a Crime Stoppers call and that Officer Brandon Wheeler was riding in his police cruiser that day. Officer McNeil stated that the police dispatcher told him that, according to the caller, a man nicknamed "Tail Light" was selling large amounts of heroin and "ice" from Room 45 at the Sunrise Inn. The caller described Tail Light as being an older black man who was bald, five feet, ten inches tall, and about 170 pounds. The caller did not provide Tail Light's legal name. Officer McNeil noted that he did not know Defendant but that Officer Wheeler and other officers had told him that Defendant's nickname was Tail Light.

Officer McNeil acknowledged that he did not know anything about the Crime Stoppers caller, although he described the caller as a "citizen informant" in the search warrant affidavit. He explained that the definition of a citizen informant was someone "calling to do a good deed" and "not getting anything out of it."

At this point, the trial court interjected and stated that it was

not dealing with that call from Crime Stoppers as a citizen informant . . . . He may have referred to this caller as a citizen informant, but there's not enough information . . . for the [c]ourt to declare him to be a citizen informant, and we don't need to hear a lot of proof about that.

When defense counsel resumed questioning, Officer McNeil denied that dispatch ever told him that the caller wished to remain anonymous. Officer McNeil testified that, at the Sunrise Inn, he knocked on the door of Room 45 and that Mr. Greenwood answered. Officer McNeil recalled that Defendant was sitting "in the far corner" at a table by the room's window. Officer McNeil did not recall entering the room until after he obtained the search warrant.

- 4 -

Officer McNeil testified that he asked Defendant and Mr. Greenwood if they would come out and talk. When asked if Officer Wheeler commented that Defendant was "acting suspicious or making movements that caused him some kind of concern," Officer McNeil agreed that Officer Wheeler said "something," although he did not remember the phrasing. According to Officer McNeil, Defendant asked who was at the door, and Mr. Greenwood told him it was the police. Defendant stood up, and Officer McNeil "heard something hit the floor or . . . hit like the wall or . . . the air conditioner that was right beside them." Officer McNeil did not recall Officer Wheeler's entering the room, but he said that, if Officer Wheeler had done so, it was one step into the room. Officer McNeil stated that the room's door remained open throughout the encounter.

Officer McNeil testified that Defendant and Mr. Greenwood came outside; Officer McNeil asked Defendant to sit down and speak with him. Defendant "didn't talk much at all" and had his cell phone sitting beside him. Officer McNeil noted that he did not tell Defendant he had to leave or stay and that Defendant "decided not to talk; he didn't talk. That was it." Officer McNeil asserted that Defendant was free to leave at that point. He noted that Mr. Greenwood asked if he could leave, and Officer McNeil replied, "Nobody said you couldn't leave."

Officer McNeil noted that he had seen Mr. Greenwood on one previous occasion and ran a warrant check on him, but he did not remember this fact until Mr. Greenwood brought it up. Officer McNeil denied that he had ever used Mr. Greenwood as an informant. He agreed that Mr. Greenwood had an active arrest warrant from California.

Officer McNeil testified that Officer Wheeler stayed on the scene while he obtained a search warrant, which took about three hours. He noted that they did not want anyone going in the room; he stated, however, that he did not deny entry to anyone and "doubt[ed]" Officer Wheeler did. Officer McNeil denied that they "seized" Room 45 before having the search warrant.

Officer McNeil testified that he asked Defendant if he could search him and that Defendant "did let me search him[.]" He agreed that the search warrant affidavit characterized the amount of cash in Defendant's wallet as "considerable." Officer McNeil stated that the cash was in Defendant's pocket but added that he "guess[ed] it was in his wallet, if that's what [he] said" in the search warrant affidavit. Officer McNeil stated relative to the amount of money, "[I]t wasn't enough for me to say, okay, yeah, you're definitely selling dope right now." When asked whether he exaggerated the amount of cash in the search warrant affidavit, he responded, "I knew it was over $100 . . . I didn't know for a [hundred] percent fact that that was dope money . . . but . . . it could have been. It was enough to say . . . some of this money was from dope."

Officer McNeil agreed that, although currency was included in the search warrant, no cash was included on the search warrant return; he averred that the money "had to have been with" Defendant when he was booked in at the jail, or it was left inside the room. Officer McNeil affirmed that no cash was confiscated during the search. He did not recall if he gave the cash back to Defendant. Officer McNeil stated that he had body camera footage of the arrest, that Officer Wheeler would not have "done [any]thing" with the cash, and that Defendant remained outside the room between the time when he was patted down and when the officers executed the search warrant.

Officer McNeil testified that, when he returned with the search warrant, Mr. Greenwood asked if he could leave and began walking through the parking lot. The officers followed and detained Mr. Greenwood after they found drugs in Room 45. Officer McNeil did not remember which officers searched Room 45 or what exactly was found.

On cross-examination, Officer McNeil testified that he included Mr. Greenwood's statement in the search warrant affidavit. He stated that Mr. Greenwood was cooperative and told Officer Wheeler that he bought drugs from Defendant four or five times in the past month. Mr. Greenwood told Officer McNeil that he bought "a 20" from Defendant, which Officer McNeil understood to mean twenty dollars' worth of methamphetamine. When asked why he performed a pat-down search of Defendant, Officer McNeil testified, "[I]t's for our safety and even theirs that they don't have weapons and they're not trying to use it against us. I don't know their intentions, so I was just doing it for my safety." He agreed that he had no reason to confiscate the cash he found.

On redirect examination, Officer McNeil testified that he had no way to know if Mr. Greenwood was telling the truth. He added that Mr. Greenwood reported having seen marijuana in Room 45 that day.

Officer Wheeler testified that, as "far as [he] remember[ed,]" no one entered the room after Officer McNeil left to get the search warrant, including Defendant. He stated that the room was "secured" to prevent the destruction of evidence, but he did not recall whether Officer McNeil told him not to allow anyone inside.

Officer Wheeler did not remember seeing Officer McNeil perform a pat-down search of Defendant. Relative to the cash Officer McNeil found, Officer Wheeler stated, "I believe he did have a stack of a lot of bills, but initially, we thought it was more money than it was, but it turned out to be lower denominations like ones and fives." Officer Wheeler did not remember whether the cash was left inside the room with Defendant's personal property and a copy of the search warrant; he similarly did not recall if the cash went with Defendant to the jail. Officer Wheeler stated that Officer McNeil was responsible for the search warrant, and he did not remember if Officer McNeil served

Defendant with the search warrant at the jail. Officer Wheeler did not recall completing any paperwork related to Defendant's cash, and he stated that the police did not seize it.

Officer Wheeler testified that he had a previous "general encounter" with Mr. Greenwood, during which he ran a warrant check. He stated that Mr. Greenwood had an active warrant in California for "dangerous drugs." He said that, while Officer McNeil was gone, other officers stopped by for short periods; he noted that he would need to check his body camera footage to verify if he, Mr. Greenwood, and Defendant were ever alone, although he acknowledged the possibility.

Officer Wheeler testified that he entered Room 45 at "initial contact" for safety reasons because Defendant "began doing a lot of shuffling" when Mr. Greenwood answered the door. Officer Wheeler said that he heard "something slammed against a table" and that Defendant had his hands down and out of the officers' view. Officer Wheeler said that he shone a flashlight on Defendant and saw an item in Defendant's hands, which "turned out to be a Taser." He stated that, once he determined Defendant did not have a weapon, it became clear that Defendant was trying to hide something.

Officer Wheeler testified that he asked to talk to the men, although he did not recall whether he asked them to exit the room. Officer Wheeler stated that he spoke to Mr. Greenwood while Officer McNeil spoke to Defendant. He did not remember if Officer McNeil took Defendant back inside the room or whether they went out of eyeshot. He noted that the officers could maintain visual contact with one another because the door remained open. Officer Wheeler recalled, though, that Officer McNeil was "in a separate area."

On recross-examination, Officer Wheeler testified that Defendant cursed and said, "[O]h, crap," when he realized the police were at the door. Officer Wheeler stated that Defendant looked like he was reaching or grabbing for something, that he heard "a plate hit the table," and that he was concerned about a gun being in the room. He acknowledged that a Taser was a weapon.

Officer Wheeler testified that Mr. Greenwood told him that he was there to buy "some product, nothing illegal," but then mentioned that he bought narcotics there recently. Mr. Greenwood said that he was from out of state and was in town for work. Officer Wheeler stated that California would not seek extradition of Mr. Greenwood because the warrant was for a misdemeanor offense.

The jail property inventory from Defendant's arrest was entered as an exhibit and reflected that a pair of glasses, a Tennessee identification card, a hotel key card, a watch, two bracelets, a hair tie, nine rings, and one earring were collected from Defendant. A notation on the list read, "[N]o money."

Defendant testified that, on the day of the incident, he and Mr. Greenwood were sitting at the table in Room 45 and that he was talking to a woman on the telephone when there was a knock at the door. Defendant stated that he looked out through the curtain while Mr. Greenwood opened the door. Defendant asked who it was, and Mr. Greenwood replied that it was the police. Defendant asked Mr. Greenwood why he opened the door and then sat back down for a better view of how many officers were at the door. Defendant said that Officer Wheeler came in and asked what Defendant was doing because he was "moving funny." Defendant denied that he was moving strangely and asked, "What do you want? Why are you in my room?" According to Defendant, Officer Wheeler claimed to be investigating a noise complaint. When Defendant denied making noise, Officer Wheeler asked the men to step outside.

Defendant testified that Officer McNeil pulled Officer Wheeler aside and whispered to him, after which "the noise complaint . . . turned into a drug complaint." Defendant stated that Officer McNeil took him back inside the room and said, "[L]et me search you," referring to the room. Defendant told Officer McNeil that, if he did not have a search warrant, Defendant had nothing to say to him. Officer McNeil asked to search Defendant's person for weapons, and Defendant responded, "That's your job . . . . I can respect that." He denied, though, that he gave Officer McNeil consent to search his person.

Defendant testified that, during the pat-down search, Officer McNeil took $221 in cash out of Defendant's wallet and remarked that it was a considerable amount of money. Defendant disagreed that it was a considerable sum. He noted that he did not consent to Officer McNeil's taking the money and that Officer McNeil told him that he was confiscating it because it was drug money. Defendant said that he again denied Officer McNeil consent to search the room and that Officer McNeil left with Defendant's wallet and money to get a warrant. Officer McNeil told Officer Wheeler to stay and watch Defendant and Mr. Greenwood. Defendant averred that Officer McNeil instructed them to "sit right there," that he did not feel free to leave, and that the officers "probably would have shot [Defendant]" if Defendant had tried to leave. Defendant said that he sat for hours until it began getting dark and that he was not allowed to reenter Room 45 during this time. Defendant noted that he would not have left the area because Officer McNeil had his money and the room was "wide open" with all of his personal property inside.

Defendant asserted that he never received a copy of the search warrant that day, nor was he told that his money was left inside Room 45. He averred that the police took his money. After the room was searched, Officers McNeil and Wheeler drove Defendant to the jail and booked him in. Defendant said that he eventually received a copy of the search warrant on January 4, 2020.

The trial court issued a memorandum opinion and order denying the motion. The court found that Officers McNeil and Wheeler were told by dispatch that, according to a

Crime Stoppers informant, a man nicknamed "Tail Light" was selling drugs out of Room 45 at the Sunrise Inn. The court further found that the officers were familiar with Defendant, his nickname, and his physical appearance. The court noted that the Crime Stoppers description "was a good general description of [D]efendant as he appeared when the door was opened at Room []45 at the Sunrise Inn." The court stated that the officers went to Room 45 for a knock and talk, that Mr. Greenwood opened the door, and that Defendant was sitting inside the room at a table. The officers asked Defendant to come to the door and searched Defendant for weapons. The court noted that Officer McNeil found a "significant amount of cash" on Defendant, although "[t]here appears to be some discrepancy as to the total amount of cash and what happened to the cash." The court found that Officer McNeil's and Defendant's testimony reflected the amount of cash was significant. Although Defendant refused to make a statement, Mr. Greenwood told the officers that he had purchased drugs from Defendant at Room 45 over the past month and that he had seen marijuana and scales on the room's table that day. The court acknowledged that Mr. Greenwood had a warrant pending in California but stated that Mr. Greenwood was not subject to extradition because it "appear[ed] that it involved a misdemeanor offense[.]"

The trial court found that Officer McNeil completed the search warrant affidavit and that he had no way to know the Crime Stoppers tip was made by a citizen informant, as he stated in the affidavit. However, the court found that the tip described Defendant in a manner that allowed the officers to identify him—as an older Black man nicknamed Tail Light who was bald, five feet, ten inches tall, and weighed 170 pounds.

The trial court stated that the officers did not testify to the following portions of the affidavit: that the scales in the room were being used to weigh illegal narcotics for resale; that Mr. Greenwood told them he purchased about one gram of methamphetamine from Defendant in the past week; and that Mr. Greenwood had purchased methamphetamine and marijuana consistently from Defendant in the past month. The court noted that Mr. Greenwood gave most of the relevant information to Officer Wheeler, who did not complete the search warrant affidavit. The court found that Mr. Greenwood's statement carried "some 'indicia of reliability' as he was coming from Room 45 with [Defendant] at the time the information was given." The court noted that Mr. Greenwood's statement could be classified as a statement against his penal interest and that it corroborated information from the Crime Stoppers tip. The court stated, "However, there are gaps between what was included in Officer McNeil's affidavit and the testimony of the officers at the suppression hearing." The court found that Defendant possessed a significant amount of cash and that Mr. Greenwood had observed two to three grams of marijuana inside the room and had bought one gram of methamphetamine from Defendant at Room 45 in the past week.

The trial court concluded,

Although there was significant information contained in the affidavit that was not introduced at the suppression hearing, there was enough information produced from the testimony of the officers at the suppression hearing that was contained in the affidavit under the totality of the circumstances to give [the magistrate[2]] probable cause to believe that a crime was being committed.

b. Second motion to suppress

In the second motion to suppress, Defendant argued that the search warrant was facially invalid for failure to comply with Tennessee Rule of Criminal Procedure 41(c)(3)(D), which states that the magistrate "shall endorse" on the search warrant the name of the officer to whom the search warrant was "delivered for execution." Defendant asserted that because the search warrant only stated that it was "issued" to Officer McNeil, it was facially defective.

Following a brief hearing on the second motion to suppress, the trial court issued a March 29, 2021 order denying relief. The trial court noted that any judge in a county could issue a search warrant, regardless of which court handled the case. The court found that Officer McNeil applied for the warrant, that a General Sessions Court judge issued the warrant, and that Officer McNeil executed the warrant. Relative to the return, the court found that Officer McNeil gave the return to the magistrate who issued the warrant and that the magistrate filed the original search warrant, return, and inventory with the Clerk of the Dyersburg City Court where the criminal case was then pending.

Defendant subsequently sought permission to file an interlocutory appeal for both motions to suppress "to prevent needless, expensive and protracted litigation" because the challenged orders would be reversed upon entry of a final judgment. Defendant also argued that an interlocutory appeal would reduce the duration and expense of litigation. The trial court granted permission to appeal.

However, this court denied permission to appeal, finding that Defendant had not proven his stated reason for appealing—that an interlocutory appeal would prevent needless, expensive, and protracted litigation. *See State v. Locust*, W2021-00685-CCA-R9-CD (Tenn. Crim. App. July 1, 2021) (Order); *perm. app. denied* (Tenn. Sept. 22, 2021).

c. Bench Trial

At the bench trial, Officer McNeil generally testified consistently with his suppression hearing testimony. However, he added that he confirmed that Defendant was

---

[2] The record reflects that a General Sessions Court judge issued the search warrant; for consistency with the language of Tennessee Rule of Criminal Procedure 41, we will refer to the judge as a magistrate.

the renter of Room 45 and that Mr. Greenwood identified himself as "Gary [U]nderwood." Officer McNeil did not elaborate on how or when he confirmed Defendant rented Room 45. He stated that he asked Defendant if he was selling drugs, and Defendant responded negatively. Officer McNeil stated that Defendant's wallet contained "around . . . $200" and that Defendant "was never told . . . he had to stay" but "stuck around" while he left to obtain the search warrant. Officer McNeil said that he served the search warrant on Defendant, who "didn't appear to [be] very happy at all." Officer McNeil stated that the search yielded drugs, digital scales, brass knuckles, a cell phone, and a handgun.

The search warrant inventory was received as an exhibit and reflected that the following items were seized from Room 45: 2.1 grams of cocaine; 12.1 grams of methamphetamine; a black smart phone; five baggies of 40 mg methadone pills; 1.9 grams of an unknown blue powder; twenty-two unknown white pills; a plastic container of unknown "strips"; fifty-one 0.5 mg alprazolam pills; seven 1.0 mg alprazolam pills; a .25-caliber Raven Arms semiautomatic pistol; fifteen .25-caliber live rounds; three sets of digital scales with methamphetamine and cocaine residue; 11.4 mg of marijuana; forty-seven and a half rectangular "Legend" pills; sixty oval "Legend" pills; one 7.5 mg hydrocodone pill; brass knuckles; two naloxone pills; seven doxycycline pills; and three amoxicillin pills. Officer McNeil testified that the officers found a tin box inside the air conditioning unit containing 2.1 grams of cocaine. He stated that methamphetamine was found "on the suspect and digital scale and plate on the table." Officer McNeil did not recall where on Defendant's person they found methamphetamine.[3] He stated that they found "more than three" and "near five" baggies of methamphetamine in different locations around the room.

Officer McNeil testified that a lockbox in the room, which was unlocked at the time of the search, contained twenty-two unknown white pills, 1.9 grams of blue powder, a set of digital scales, and a Listerine container with "astringents" inside. In addition, the lockbox contained "pink oval pills" that Officer McNeil identified as being Xanax, but which were not tested.

Officer McNeil testified that an unlocked digital safe[4] was also found in the room and that it contained marijuana, the .25-caliber pistol, and the .25-caliber ammunition. The brass knuckles were found on the nightstand. The two other sets of digital scales were on a box by the air conditioning unit and in a desk drawer, respectively. Officer McNeil

---

[3] The transcript reflects that the evidence envelope holding the methamphetamine, which was part of the exhibit, contained a notation that methamphetamine was found on Defendant's person. Defendant raised a discovery objection at this point and was overruled. The exhibit was retained by the clerk's office, and no photographs of the envelope appear in the appellate record.

[4] Officer McNeil described the safe as being "hidden on the floor" and also "on the nightstand."

agreed that six substances from the room "for some reason weren't sent to the [Tennessee Bureau of Investigation (TBI)] lab and didn't get tested[.]"

On cross-examination, Officer McNeil testified that he did not remember if he found methamphetamine on Defendant's person. He stated, "I wrote upon number 2, 12.1 grams of meth and . . . it says, 'on the suspect, plate on table, black digital safe on nightstand.'"[5]

Officer McNeil acknowledged his suppression hearing testimony and his statement in the search warrant affidavit that the Crime Stoppers tip came from a "citizen informant." Officer McNeil stated that he learned the term citizen informant at "several narcotic investigation schools" and that it referred to "virtually a reliable informant." He acknowledged that he did not know if the Crime Stoppers informant had a criminal history. He stated that he never knew the identity of Crime Stoppers callers and noted, "At the time I have to take their word as a reliable source of information." When asked why he described the Crime Stoppers caller to the magistrate as a citizen informant in light of his lack of knowledge of the person's criminal history, Officer McNeil stated, "As far as I know, they are a reliable informant . . . . Because I do not know anything about their criminal history." He agreed that different standards existed for criminal informants but maintained that it was possible the Crime Stoppers informant had no criminal history.

When asked why he told the magistrate that the Crime Stoppers informant wished to remain anonymous, Officer McNeil testified that Crime Stoppers was "an anonymous-like source" and that only the Crime Stoppers worker knew the identity of callers. He acknowledged his suppression hearing testimony that police dispatch never told him that the Crime Stoppers informant wished to remain anonymous. He did not remember if he asked the dispatcher whether the informant wished to remain anonymous. Officer McNeil noted that he would "assume" Crime Stoppers callers did not want anyone to know their identities, although he had never worked the Crime Stoppers line. Officer McNeil stated that the search warrant affidavit and his suppression hearing testimony were "based on facts" and "based on the truth."

Officer McNeil agreed that the search warrant return did not reflect the considerable amount of cash Defendant possessed. He stated that he could not say whether the cash was obtained through drug sales. He acknowledged that "considerable" was an "opinionated term." Officer McNeil thought that he placed Defendant's cash in the same place he placed a copy of the search warrant in the room.

---

[5] Exhibit 1 containing the search warrant inventory reflects that the methamphetamine was number 2 on the list. However, the notation about the methamphetamine's location does not appear on Exhibit 1; Exhibit 2 was the seized cocaine. It is unclear to which document Officer McNeil referred here.

Relative to the officers' body camera recordings, Officer McNeil testified that "a few days ago" he was told that felony-related footage was deleted automatically two years after the incident. He agreed that the recordings would have shown the pat-down search of Defendant. He stated that he did not typically include in a police report that body camera footage existed. When asked, "You didn't put this body cam footage in discovery[?]" Officer McNeil answered, "Yes." Officer McNeil said that he did not prepare the "indictment package" or know who had done so. He noted that, to his knowledge, the recordings would have been available at the time of the suppression hearing.

Officer McNeil testified that, when he arrived at the Sunrise Inn, he "went straight to the room, and that's when we knocked on the door." Officer McNeil did not recall ordering Defendant out of Room 45, and he noted that he could not "order anybody out of a room." Officer McNeil referred to "pull[in]g" Defendant out of the room, although he clarified that he did not physically pull Defendant outside and maintained that he did not order Defendant to come out. Officer McNeil stated that he spoke to Defendant but that "[i]t got to a point where [Defendant] did not want to speak."

Officer McNeil testified that he delivered the warrant return to the magistrate, that the evidence was taken to the Dyersburg Police Department's evidence lockup, and that no representatives of the county or the Dyer County Sheriff's Office were present when he obtained the search warrant.

On redirect examination, Officer McNeil averred that he was not being untruthful with the magistrate when he called the Crime Stoppers caller a citizen informant. He explained that Crime Stoppers was an anonymous tip line, that dispatch relayed the information to the police, and that the police followed up on the tip. Officer McNeil did not remember any specific body camera recordings from the incident but said that he was "pretty sure" the officers wore body cameras that day. He could not remember whether he asked his captain about the footage in 2020.

Officer McNeil stated that Room 45 contained food, a rack of men's shoes, a large quantity of "wax cubes," clothing, and "hygiene stuff" such that he could tell Defendant was living there. He averred that the clothing was of a size that would fit Defendant. Officer McNeil stated that he sought the search warrant because Defendant said, "No, you can't search my room." He said that Defendant never denied that the room was his. Officer McNeil did not recall whether Defendant asked to take some of the clothing with him.

Officer Wheeler testified consistently with his suppression hearing testimony. In addition, he stated that he had dealt with Defendant previously and that Defendant remained in the parking lot while Officer McNeil obtained the search warrant.

- 13 -

On cross-examination, Officer Wheeler testified that he had a body camera the day of the incident. He stated that officers logged recordings based upon the date and time and the police report number. He explained that recordings related to felony offenses had an automatic two-year "purge date." Officer Wheeler did not recall if he searched Mr. Greenwood. When asked whether Mr. Greenwood told him that he was at Room 45 to buy a television, Officer Wheeler responded, "I can't disagree with you."

TBI Special Agent forensic scientist Rachel Strandquist, an expert in forensic identification of drugs, testified that she tested several substances in this case. Her report reflected that a white crystalline substance tested as 3.32 grams of methamphetamine; she noted that four other similar bags were not tested because the total weight of the substances was not over twenty-six grams. In addition, an off-white, rock-like substance tested as 0.7 grams of cocaine base, and she noted that three additional "plastic corner bags" of white powder had not been tested. Agent Strandquist stated that a blue tablet tested positive for alprazolam, or Xanax, and methamphetamine; she could not speculate from where the methamphetamine came or whether the tablet was made from both alprazolam and methamphetamine. Agent Strandquist stated that one of the white tablets, which did not contain pharmaceutical markings, did not test as being a controlled substance. Agent Strandquist said that a chemical and color analysis of plant material reflected that it was 4.6 grams of "cannabis."

On cross-examination, Agent Strandquist testified that the TBI laboratory no longer included a schedule number next to marijuana on reports because presumptive testing, which was done in this case, did not distinguish between marijuana and hemp. She said that confirmatory testing of the percentage of THC present in the plant material was not performed in this case. She noted, "I don't think most presumptive tests have any sort of percentage [accuracy] with them, just because they are a vague test . . . . There's many things that could give false positives." Agent Strandquist stated that, in her experience, the alprazolam pill probably came into contact with methamphetamine.

Dyer County Deputy Clerk Bridgette Brown provided the following judgment forms as exhibits: In Dyer County Circuit Court case number C93-247, Defendant was convicted of aggravated rape and aggravated burglary on November 5, 1993. He was sentenced to concurrent terms of twenty and four years, respectively. In Dyer County Circuit Court case number C93-246, Defendant was convicted of aggravated sexual battery and aggravated burglary on February 15, 1994. He was sentenced to concurrent terms of ten years and four years, respectively, and the sentences in case number C93-246 were run consecutively to the sentences in case number C93-247.

After the close of the State's evidence, the State dismissed Count 4, possession of methadone, Count 6, possession of naloxone, and Count 7, possession of hydrocodone. The trial court found that Defendant was not guilty of Count 5, simple possession of

marijuana, due to the TBI laboratory's failure to identify the plant material as a Schedule VI substance. The court found Defendant guilty in Counts 1, 2, 8, 9, and 10, as charged. The court found Defendant guilty in Count 3 of the lesser-included offense of simple possession of Xanax. The court merged Count 9, possession of a firearm during the commission of a dangerous felony, into Count 10, possession of a firearm by a violent felon.

### d. Sentencing

At the sentencing hearing, Tennessee Department of Correction Probation and Parole Officer Darrell Smothers testified that he composed the presentence report in Defendant's case. He stated that Defendant pled guilty on January 4, 2019, to simple assault, and that he received an eleven-month, twenty-nine-day sentence suspended to time served. Officer Smothers identified a copy of the Dyersburg City Court judgment reflecting that guilty plea and sentence.

On cross-examination, Officer Smothers acknowledged that the conviction was not included in the State's "notice of impeaching convictions and enhancement." On redirect examination, Officer Smothers agreed that the assault conviction was a misdemeanor and not a crime of dishonesty.

Defendant gave the following allocution:

> I object to the fact that I'm charged in regards to affidavit of complaints out of the municipal court, in regards to State offenses, where the municipal court doesn't have any jurisdiction of the State offense. And they're alleging that on the 23rd, the affidavit of complaint was approved. The date is later than the date on the actual alleged search warrant. That there's never ever been the proof that there actually even exists . . . a search warrant. That's all I have, Judge.

The presentence report reflected that Defendant was sixty-five years old, five feet, nine inches tall, and 190 pounds. Defendant stated the following regarding the offenses:

> I was prosecuted on a State charge regarding a search warrant. I was prosecuted in a municipal court for violating a State court charge and the municipal court did not retain jurisdiction. In which I object to the search warrant prosecution being from city court.

> I object to the charge coming out of the city court and being prosecuted in the Circuit Court.

The judge that allegedly issued the search warrant . . . issued a memorandum requesting not to testify at trial which violates State law.

The presentence report included that, in addition to his 1993 and 1994 convictions in Case numbers C93-246 and C93-247, on June 11, 1991, Defendant received one year of supervised probation related to a conviction for "sale of [a] counterfeit controlled substance." On March 18, 1993, Defendant paid a cash bond forfeit in the Jackson City Court related to a charge for simple possession of cocaine.

In addition, Officer Smothers wrote that, on September 6, 1990, Defendant pled guilty in the Seventh Judicial Court for Genesee County, Michigan, to possession of cocaine in case number 90-043293-FH. An order for a bench warrant was issued relative to that case on November 8, 1990; however, on March 23, 2000, the warrant and "order to apprehend" were recalled.

Defendant was incarcerated in the Tennessee Department of Correction (TDOC) from November 5, 1993, until August 21, 2013. While in prison, Defendant completed courses in "career management for success" and anger management, and he also completed therapeutic drug treatment.

Defendant reported that he graduated high school in 1977 and completed two and one-half years of community college. He drank alcohol beginning at age nineteen or twenty and began using marijuana at age eighteen. He noted that, in 2019, he used a little bit" of marijuana daily. Defendant used cocaine frequently from 1982 or 1983 until his incarceration in 1993. Defendant reported using methamphetamine daily from 2016 until his arrest in this case on December 20, 2019. Defendant stated that he used Xanax and methadone to "come down" from methamphetamine. Defendant reported an incident in which a "misunderstanding" over his having taken too much Tylenol resulted in his transport to a mental health hospital.

Defendant told Officer Smothers that he had not held a "payroll job" since his release from TDOC custody in 2013; he noted that he had not applied for jobs because he felt no employer would hire him in light of his criminal record. Defendant estimated that he earned $1,500 in 2019 from doing "odd jobs" and stated that he received Social Security benefits from his estranged wife. Defendant stated that he received and sold stolen clothing and shoes in exchange for drugs; he stated that the clothing and pistol seized in his hotel room had been traded for drugs. Defendant averred that he did not typically sell drugs.

Defendant's Strong-R assessment rated him as having high needs in alcohol/drug use and employment and moderate needs in family/friends. An April 13, 2022 community corrections supervision report included Defendant's statement relative to this case, which

- 16 -

read, "I did not receive a fair trial. The judge who monitored the trial had a conflict of interest. I was denied a defense at trial."

The trial court stated that it had considered the evidence at trial and the sentencing hearing, the presentence reports, the principles of sentencing, the parties' arguments, the nature and characteristics of the offenses, mitigating and enhancement factors, statistical information provided by the Administrative Office of the Courts relative to sentencing practices, Defendant's statements, and the validated risk and needs assessment. The court found that Defendant was a Range II, multiple offender.

The trial court applied enhancement factor (1), that Defendant had a history of criminal convictions or behavior in addition to those necessary to establish his sentencing range, and (13), that Defendant was on probation when the offenses were committed. *See* Tenn. Code Ann. § 40-35-114(1), (13). The court found that no mitigating factors applied.

Relative to consecutive sentencing, the trial court noted that it had merged Count 9 with Count 10 and that mandatory consecutive sentencing did not apply. However, the court found two applicable factors in favor of discretionary consecutive sentencing—that Defendant had an extensive history of criminal activity and that Defendant was being sentenced for offenses committed while he was on probation. *See* Tenn. Code Ann. § 40-35-115(b)(2), (6). The court noted that it "rarely [saw] lists this long of very serious offenses committed by [D]efendant."

The trial court found that Defendant was not suitable for alternative sentencing because confinement was necessary to protect society by restraining Defendant, who had a thirty-year history of criminal conduct. The court also found that confinement was necessary to avoid depreciating the seriousness of the offenses and that confinement was particularly suited to provide an effective deterrent to others.

The trial court ordered sixteen-year sentences in Counts 1 and 2, as well sentences of eleven months and twenty-nine days in Counts 3 and 8. Counts 1, 2, 3, and 8 were ordered to be run concurrently. The court merged Count 9 with Count 10 and imposed a twelve-year sentence, to be served consecutively to the sentences in Counts 1, 2, 3, and 8, for a total effective sentence of twenty-eight years at thirty-five percent service.

After the motion for new trial hearing, the trial court issued a written order denying relief. The court found that the evidence was sufficient to support the convictions, that the sentences were in the appropriate range, that Count 10 was appropriately run consecutively to the other sentences, and that, after reviewing the transcripts of the suppression hearings, the court concurred in Judge Moore's rulings. Defendant timely appealed.

## Analysis

On appeal, Defendant contends that (1) the trial court erred by denying his motions to suppress; (2) the evidence is insufficient to establish that he possessed the drugs and weapons in Room 45; and (3) the trial court abused its discretion by ordering partial consecutive service of his sentences. The State responds that the trial court properly denied the motions to suppress, that the evidence is sufficient, and that partial consecutive sentencing was appropriate.

### I.        Motions to Suppress

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005). In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider the proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### A. First motion to suppress

Relative to the first motion to suppress, Defendant argues that the search warrant affidavit did not establish probable cause that a crime was occurring. In support of his position, Defendant asserts that the trial court unduly relied upon the Crime Stoppers tip because the basis for the informant's knowledge was not included in the affidavit and that Officer McNeil misrepresented the informant's credibility by deeming them a "citizen informant."

Defendant also asserts that the trial court erred when it found that Mr. Greenwood's statements had indicia of reliability because they were against his own penal interest, arguing that Mr. Greenwood was not a known police informant; that little chance existed he would be arrested for reporting previous drug purchases; that the statements were, in fact, self-serving because they "endear[ed]" Mr. Greenwood to the police as a source of information and the statements involved a lesser crime (drug possession) than the crime of which Mr. Greenwood accused Defendant (drug sales); and that the officers failed to corroborate the illegal activity alleged in the Crime Stoppers tip. Defendant continues that Mr. Greenwood's prior drug purchases did not make it more or less likely that Defendant had those drugs in Room 45 on the day in question or create a nexus between Room 45, Defendant, and the alleged illegal activity. Further, Defendant claims that Mr.

Greenwood's statement that he had seen [6]marijuana in Room 45 that day "should also be deemed unreliable, since the substance presumed to be illegal marijuana by the State was never tested or otherwise proven to have been, in fact, an illicit substance."

Finally, Defendant argues that this court should exclude Defendant's cash from our consideration of this issue because the search of Defendant's wallet exceeded the scope of a permissible pat-down search for weapons. Alternatively, Defendant claims that Officer McNeil misrepresented the amount of cash to the magistrate by calling it "substantial" and that the statement should be afforded little or no weight.

Relative to the corroboration, at oral argument, Defendant argued that the Crime Stoppers tip and Mr. Greenwood's statement were unreliable and could not corroborate one another to a degree that probable cause would result. Defendant also asserted that corroboration of information in the Crime Stoppers tip relative to legal activity could not serve to corroborate the alleged illegal activity.

The State responds that, although the reliability of individual sources of information remains a factor in this court's assessment of the totality of the circumstances, in this case, corroboration of the two sources yielded information sufficient to support probable cause.

The United States and Tennessee constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Both the United States Constitution and the Tennessee Constitution instruct that a search warrant may not be issued "unless a neutral and detached magistrate determines that probable cause exists for [its] issuance." *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 240 (1983); *Henning*, 975 S.W.2d at 294; and *State v. Jacumin*, 778 S.W.2d 430, 431 (Tenn. 1989), *overruled on other grounds*); U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7.

"Probable cause is more than a mere suspicion but less than absolute certainty." *Id.* "[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *State v. Bishop*, 431 S.W.3d 22, 41 (Tenn. 2014). A determination of probable cause is "extremely fact-dependent." *Tuttle*, 515 S.W.3d at 300 (quoting *State v. Bell*, 429 S.W.3d at 524, 534 (Tenn. 2014)) (internal quotation marks omitted). Upon review, this court gives "'great deference' to a magistrate's determination that probable cause exists." *Id.* (quoting *Jacumin*, 778 S.W.2d at 431-432, *overruled on other grounds*).

---

[6] This section of Defendant's brief states that Mr. Greenwood reported having purchased marijuana that day; however, our review of the record indicates that Mr. Greenwood only reported having seen marijuana in Room 45.

"A sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." *State v. Saine*, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting *Henning*, 975 S.W.2d at 294). In determining probable cause for the issuance of a search warrant, our supreme court explained that a magistrate must "exercise[] independent judgment," and the affidavit "must contain more than mere conclusory allegations by the affiant" but must have facts upon which the magistrate may make its commonsense probable cause determination. *Tuttle*, 515 S.W.3d at 300 (citing *Henning*, 975 S.W.2d at 294; *State v. Smotherman*, 201 S.W.3d, 657, 662 (Tenn. 2006)). The magistrate must be able to draw a "reasonable conclusion" from these facts "that the evidence is in the place to be searched." *Id.* (citing *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993)). "In other words, the affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id.* (citing *Saine*, 297 S.W.3d at 206)). The facts in the affidavit which can establish this nexus include:

> [T]he type of crime, the nature of the items, . . . the normal inferences where a criminal would hide the evidence[,] . . . whether the criminal activity under investigation was an isolated incident or a protracted pattern of conduct[,] . . . and the perpetrator's opportunity to dispose of incriminating evidence.

*Id.* at 300-01 (internal citations omitted).


However, an issuing magistrate cannot base a determination of probable cause on "the bare conclusions of others." *Gates*, 462 U.S. at 239. For example, "[a] sworn statement of an affiant that 'he has cause to suspect and does believe that' liquor illegally brought into the United States is located on certain premises" is insufficient to support probable cause. *Id.* "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause[.]" *Id.* "[O]nly the information contained within the four corners of the affidavit may be considered" in determining whether probable cause supported the issuance of the search warrant. *State v. Keith*, 978 S.W.2d 861, 870 (Tenn. 1998) (citations omitted).

Before our supreme court's decision in *Tuttle*, Tennessee's courts applied the two-pronged *Aguilar-Spinelli*[7] test, as adopted by our supreme court in *Jacumin*, to evaluate the reliability of hearsay information included in search warrant affidavits. *See Tuttle*, 515 S.W.3d at 301. A presumption of reliability attached to police officers and "citizen informants, so long as the affidavit identifie[d] the source of the information as a citizen informant." *Id.*; *see State v. Williams*, 193 S.W.3d 502, 507 (Tenn. 2006) (discussing that

---

[7] The test was named after the United States Supreme Court's decisions in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969).

a citizen informant "is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety" and "does not expect any gain or concession in exchange for his information") (quoting *State v. Stevens*, 989 S.W.2d 290, 294 (Tenn. 1999)); *see also State v. Marcus*, 660 N.W.2d 837, 842 (Neb. 2003) (stating that citizen informants have no "motive to exaggerate, falsify, or distort the facts to serve [their] own ends"). In contrast, information supplied by anonymous informants or members of the "criminal milieu" was afforded no presumption of reliability. *Tuttle*, 515 S.W.3d at 301 (citing *Smotherman*, 201 S.W.3d at 662). A search warrant affidavit relying upon an anonymous or criminal informant had to establish both the informant's basis of knowledge and veracity or credibility. *Id.*

The basis of knowledge prong, which existed "to prevent warrants from being issued based on conjecture or rumors," could be satisfied by including that the informant personally observed the relevant events or obtained the information firsthand. *Id.* at 302 (quoting W. Mark Ward, *Tennessee Criminal Trial Practice*, § 4:10 (2016-17 ed.)).

Relative to the credibility prong, the affidavit had to contain facts "which permit[ed] the magistrate to determine either the inherent credibility of the informant or the reliability of his information on the particular occasion." *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Although conclusory statements without more detail were insufficient, *see id.*, the "requisite volume or detail of information needed to establish the informant's credibility [was] not particularly great." *Tuttle*, 515 S.W.3d at 302 (quoting *State v. Lowe*, 949 S.W.2d 300, 305 (Tenn. Crim. App. 1996)) (internal quotation marks omitted).

Moreover, independent police corroboration of the information provided by the informant could "make up the deficit" in either prong. *Id.* (citing *Aguilar*, 378 U.S. at 114; *Spinelli*, 393 U.S. at 415-16; and *Smotherman*, 201 S.W.3d at 662)) (additional citations omitted). Independent police corroboration did not need to "supply probable cause by [itself] or . . . point unequivocally toward guilt"; rather, it must provide an "'unusual and inviting explanation'" even though the observations are "'as consistent with innocent as with criminal activity.'" *Moon*, 841 S.W.2d at 341 (quoting Wayne R. LaFave, 1 *Search and Seizure*, § 3.3(f), at 683 (2d ed. 1978)). In *Moon*, this court noted, "Corroboration of more than a few minor elements of the informant's information is necessary . . . especially if the elements relate to non-suspect behavior." *Id.* (citing *United States v. Bush*, 647 F.2d 357, 363 (3rd Cir. 1981)). However, our supreme court has also stated, "Corroboration of 'only innocent aspects of the story' may suffice." *Bishop*, 431 S.W.3d at 38 (quoting *State v. Melson*, 638 S.W.2d 342, 355 (Tenn. 1982)). The United States Supreme Court has also discussed that corroboration of innocent details may be enough "for the practical, common-sense judgment called for in making a probable cause determination." *Gates*, 462 U.S. at 244 (noting that an anonymous informant correctly informed police that the defendant's car would be in Florida, that the defendant would fly to Florida in "the next day or so," and that he would drive the car toward Bloomingdale, Illinois).

- 21 -

In *Tuttle*, our supreme court abandoned the *Jacumin/Aguilar-Spinelli* test for determining the credibility of anonymous or criminal informants in favor of the totality-of-the-circumstances analysis announced in *Gates*. Nevertheless, the *Tuttle* court stated,

> We reiterate that, under the totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility remain highly relevant considerations. Rather than separate and independent considerations, they "should [now] be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."

*Id.* at 307-08 (quoting *Gates*, 462 U.S. at 230).

In recent years, this court has considered credibility and corroboration issues using the principles articulated in *Moon* and *Smotherman* in the context of *Tuttle*; we find examination of these cases to be instructive. In *State v. Haithcote*, No. M2018-01943-CCA-R3-CD, 2020 WL 4596115, at *5 (Tenn. Crim. App. Aug. 11, 2020), a search warrant contained a conclusory statement that a confidential informant had been used by police previously but did not otherwise provide sufficient information about the informant's credibility. However, this court found that the deficiency was adequately addressed by officers' independently corroborating several aspects of the tip. *Id.* The officers conducted a controlled drug buy to confirm the informant's assertion that he could buy four pills from his dealer for $140. *Id.* In addition, the informant told officers that his dealer's source, the defendant, was in his dealer's driveway at a specific time, which officers observed. *Id.*

In *State v. Campbell*, No. W2019-00626-CCA-R3-CD, 2020 WL 4346804, at *1 (Tenn. Crim. App. July 28, 2020), police received "cybertips" from the National Center for Missing and Exploited Children regarding two child pornography images uploaded to Andrew Galbreath's email address. Upon his arrest, Mr. Galbreath confessed and told police that he sent one of the pornographic images to the defendant, as well as other images, and he identified a satellite image of the defendant's apartment complex. *Id.* at *2. The police confirmed the defendant's address by searching LexisNexis and obtained a search warrant for the defendant's residence the same day based upon this information. *Id.* The search warrant affidavit included information about the cybertips, the content of the image at issue, Mr. Galbreath's statement regarding his having sent the image to the defendant and identifying the defendant's apartment complex, and a quantity of information about the practices of child pornographers generally, which the officer had acquired through his training and experience. *Id.* This information included that child pornographers typically knew the personal information of individuals with similar interests, that they kept images on computers and other electronic devices, that evidence of deleted images remained on

electronic devices, and that the defendant might dispose of evidence if he discovered Mr. Galbreath's arrest. *Id.*

On appeal, this court concluded that, although it was "a close case," the totality of the circumstances established probable cause because Mr. Galbreath's statement was credible and adequately corroborated. *Id.* at *9. This court declined to adopt a federal standard providing that a person's confessing to a crime and implicating another provides probable cause for a search warrant without further corroboration, finding that *Tuttle* "remain[ed] the appropriate standard for determining whether a search warrant affidavit is sufficient to establish probable cause." *Id.* at *13. Relative to Mr. Galbreath's credibility, this court noted that he had firsthand knowledge of the defendant's illicit activities; that he incriminated himself as well as the defendant; and that it was unlikely he was "motivated by revenge" because he implicated the defendant in a lesser offense than the one to which he confessed. *Id.* In addition, Mr. Galbreath's information was consistent with the officer's experience that people who possessed child pornography often exchanged images with others and knew their personal information, which was included in the search warrant affidavit. *Id.* This court also found "persuasive" that Mr. Galbreath's statement implicated "the targeted property," the defendant's home. *Id.* (citing *Moon*, 841 S.W.2d at 340). Relative to corroboration, this court discussed that the image Mr. Galbreath described was one of the images flagged by the NCMEC tip and that the police verified the defendant's address using LexisNexis and the satellite map. *Id.* at *13-14.

In this case, the search warrant affidavit is devoid of information establishing the basis of knowledge of the Crime Stoppers tipster, and it mischaracterizes their credibility by deeming them a citizen informant. We note that Officer McNeil admitted at the suppression hearing and trial that, according to his training, a citizen informant was "calling to do a good deed," "not getting anything out of it," and "virtually a reliable informant." He also acknowledged that he knew nothing about the Crime Stoppers caller. Although he maintained that he had no intent to mislead the magistrate, Officer McNeil's training and experience were such that his use of the term citizen informant was reckless at best.

However, the mischaracterization is tempered by Officer McNeil's statement immediately after that the informant was a Crime Stoppers caller. The magistrate would have been familiar with Crime Stoppers as a telephone line where callers could anonymously report criminal activity. As the trial court observed at the suppression hearing, the information in the search warrant affidavit was clearly insufficient to treat the Crime Stoppers caller as a citizen informant, and the court appropriately considered them an anonymous informant whose information required corroboration.

Likewise, although Mr. Greenwood's basis of knowledge (firsthand observation) is included in the affidavit, his credibility as a member of the criminal milieu is not evident. As Defendant noted at oral argument, although Mr. Greenwood's statement was technically

against his penal interest, Mr. Greenwood admitted to a lesser crime than that of which he accused Defendant. *Cf. Campbell*, 2020 WL 4346804, at *13. As a result, his confession does not serve to meaningfully enhance the credibility of the information.

Relative to Defendant's argument regarding Mr. Greenwood's ability to distinguish between legal hemp and illegal marijuana, the State's failure to properly test the substance and Defendant's eventual acquittal on that count of the indictment is irrelevant to whether the information was reliable to the magistrate at the time he made the probable cause determination. We note that Defendant cites no authority in support of this claim.

Although the reliability of the Crime Stoppers tip and Mr. Greenwood's statement are, respectively, not without issue, the applicable standard is whether the totality of the circumstances supports the magistrate's probable cause determination. Based upon Tennessee and federal jurisprudence, the two sources and independent police corroboration in this case were sufficient to give the magistrate probable cause to believe a crime was occurring. Officers McNeil and Wheeler confirmed that Defendant, with whose nickname and general appearance[8] they were already familiar, was in Room 45 at the Sunrise Inn, as reported. *See Gates*, 462 U.S. at 244; *Bishop*, 431 S.W.3d at 38. Mr. Greenwood advised Officer Wheeler that he had purchased methamphetamine from Defendant in Room 45 several times in the past month, including the previous week, which was consistent with the Crime Stoppers tip that Defendant was actively selling heroin and methamphetamine from Room 45. Mr. Greenwood also stated that he saw scales and marijuana in the room that day; although marijuana and methamphetamine are distinct substances, the presence of illegal drugs and scales was generally consistent with the Crime Stoppers tipster's description of an ongoing drug sales scheme.

Relative to Defendant's cash, Defendant argues that Officer McNeil mischaracterized the amount of cash he found on Defendant's person by describing it as "substantial." Defendant and the State disagree about whether $221 is substantial under the existing caselaw. *See, e.g., State v. Jones*, No. W2018-01421-CCA-R3-CD, 2020 WL 974197, at *9 (Tenn. Crim. App. Feb. 27, 2020) (noting that the defendant had $118 in his wallet, which was less suspicious than the co-defendant's possessing more than $400; co-defendant was also subject of the police's tip); *but see State v. Nelson*, 275 S.W.3d 851, 867 (Tenn. Crim. App. 2008) (affirming intent to sell cocaine, in part, when defendant had $114 in cash and a check for an unspecified amount).

---

[8] We note that, although Defendant's appearance at the time of the incident was not discussed at the bench trial, the trial court noted in its denial of the motion to suppress that the anonymous tipster accurately described Defendant, and the trial court could also observe and compare Defendant's appearance at the bench trial.

Again, we note that Officer McNeil seems to have been imprecise with his language in the search warrant affidavit—at the suppression hearing, he admitted that he originally believed Defendant to have some amount above $100, which strains the bounds of what could reasonably be called "considerable," and that it was not enough to immediately be identifiable as drug money. Although the actual amount was around $220, which we agree with the State could reflect ten or more $20 transactions, this information was not contained in the four corners of the affidavit. However, as we discuss below, any error in the inclusion of the cash was harmless because it was not essential to the probable cause determination.[9]

Defendant also contends for the first time on appeal that the evidence of the cash should have been suppressed because it exceeded the scope of a pat-down weapons search and that this court should analyze the search warrant affidavit without reference to it. The State has not argued that this ground for relief has been waived; however, because Defendant did not raise this issue in the court below, we will examine it only for plain error.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the

---

[9] We note that Defendant has raised this issue in the context of the weight afforded to the cash, not as an issue of Officer McNeil's deceiving the court. *See State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (quoting *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978)); *see also Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

- 25 -

remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

At the suppression hearing and the trial, Officer McNeil's stated reason for searching Defendant was to check him for weapons; unlike other cases when large amounts of cash were loose in suspects' pockets, Defendant's money was inside his wallet. Officer McNeil did not claim to be searching for weapons when he opened the wallet, and there is no indication that he felt a distinct and suspicious shape such that the "plain feel" doctrine would apply. *See, e.g., State v. Bridges*, 963 S.W.2d 487, 494 (Tenn. 1997); *State v. Dunlap*, No. E2022-00593-CCA-R3-CD, 2023 WL 5976778, at *8 (Tenn. Crim. App. Sept. 14, 2023). As such, the search exceeded the proper scope of a weapons pat-down.

When evidence is obtained in violation of Fourth Amendment search and seizure protections, such evidence must be excluded at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009); *United States v. Leon*, 468 U.S. 897, 906 (1984); *see also State v. Reynolds*, 504 S.W.3d 283, 309-10 (Tenn. 2016). A court may redact a search warrant affidavit to remove any references to tainted information that was illegally obtained, and "any resulting search is deemed constitutional so long as the redacted affidavit has been properly scrutinized and still suffices to establish probable cause." *State v. Smith*, No. W2009-02678-CCA-R3-CD, 2011 WL 6885348, at *7 (Tenn. Crim. App. Dec. 27, 2011); *see State v. Shanklin*, No. M2019-01896-CCA-R3-CD, 2021 WL 1082043, at *10 (Tenn. Crim. App. Mar. 22, 2021), *perm. app. denied* (Tenn. May 12, 2021).

We conclude that consideration of the error is not necessary to do substantial justice because, even excluding the cash, the issuance of the search warrant was supported by probable cause. The non-specific assertion that Defendant had a considerable amount of cash in his wallet is comparatively benign in light of the information in the Crime Stoppers tip and Mr. Greenwood's statement accusing Defendant of selling drugs on a consistent basis out of Room 45. As we discussed above, the two sources and Officer McNeil's observations corroborated one another to support the magistrate's finding of probable cause. Defendant is not entitled to relief on this basis.

B. Second motion to suppress

Defendant argues that because the warrant was endorsed as having been issued to Officer McNeil, rather than "delivered for execution," as specified in Tennessee Rule of Criminal Procedure 41(c)(3)(D), the search warrant is facially invalid. Defendant asserts that this issue is systemic because the warrant form includes the complained-of verbiage. The State responds that Defendant's interpretation of the rule is hypertechnical and that the warrant is valid because it was issued to Officer McNeil, who also executed it and filed the return.

Tennessee Rule of Criminal Procedure 41(c)(3) provides,

(3) . . . If the magistrate is satisfied that there is probable cause to believe that grounds for the application exist, the magistrate shall issue a warrant as follows:

. . . .

(D) The magistrate shall endorse on the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution.

Our examination of Rule 41's plain language reflects that "issued" and "delivered for execution" are used interchangeably. Most notably, Rule 41(g)(5)(B) provides that a defendant may seek suppression on the basis that the magistrate "did not endorse on the warrant . . . the name of the officer to whom the warrant was issued." If we accept Defendant's argument that issuance and delivery for execution have distinct meanings, then it follows that no penalty exists for failure to include the name of the officer to whom the warrant was delivered for execution. Moreover, even if we concluded that Dyer County's warrant form was in technical violation of Rule 41, it would fall squarely into our supreme court's narrowly-tailored good faith exception to Rule 41's exclusionary rule—an "inconsequential" deviation clearly resulting in no prejudice to Defendant. *State v. Daniel*, 552 S.W.3d 832, 838 (Tenn. 2018); *see Lowe*, 552 S.W.3d at 859 ("When a magistrate has issued a warrant in compliance with constitutional requirements but, in good faith, fails to comply with Rule 41's technical requirement[s] . . . 'societal interests are not advanced when the exclusionary rule applies to exclude evidence obtained from execution of the warrant.'" (quoting *State v. Davidson*, 509 S.W.3d 156, 186 (Tenn. 2016)). We note that Defendant was not prejudiced in any way by the warrant's listing Officer McNeil as the person to whom the warrant was issued; Officer McNeil applied for the warrant, signed the affidavit, received the warrant from the magistrate, and executed the warrant. Defendant is not entitled to relief on this basis.

II.     Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his convictions, arguing that his presence in Room 45 does not establish that he had constructive possession of the drugs and gun. The State responds that the evidence of possession is sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence

are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

It is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance. Tenn. Code Ann. § 39-17-417(a)(4). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Similarly, it is unlawful to intentionally or knowingly possess certain weapons, including brass knuckles. Tenn. Code Ann. § 39-17-1302(a)(6). It is also unlawful to possess a firearm during the commission of a dangerous felony or after being convicted of a felony crime of violence. Tenn. Code Ann. §§ 39-17-1307(b)(1)(A),-1324(a).

Defendant does not contest the sufficiency of the evidence relative to the existence of the controlled substances or weapons at issue; similarly, he does not argue that the evidence of intent to sell or deliver was insufficient. Accordingly, we will confine our examination of the sufficiency of the evidence to the proof of possession. The State's theory in this case was one of constructive possession. "[I]n criminal cases, a possession element may generally be established by showing actual or constructive possession." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). Actual possession refers to physical control over an item, whereas constructive possession "requires that a person knowingly have 'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975)); *see also State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). "Constructive possession depends on the totality of the circumstances in each case." *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013). The "mere presence" of an individual in an area where drugs are found and the "mere association" of an individual with a person in control of a drug "is not sufficient, standing alone, to find constructive possession." *Id.* (citing *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000); *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)).

Defendant argues that his case is analogous to the facts in *Jones*, 2020 WL 974197. In *Jones*, police officers were conducting an investigation at a motel and knocked at the door of a room in which the defendant and a co-defendant[10] were present. *Id.* at *1. After several minutes, the co-defendant opened the door. *Id.* The officers detained the co-defendant and discovered that he had $409 on his person in several denominations. *Id.* The officers also saw a razor blade and a plate with white powder in plain view. *Id.* The officers noted that men's clothing and several pieces of luggage were inside the room and that both beds were "disheveled." *Id.* One of the officers entered the room to detain the defendant, who had $118 on his person. *Id.* at *1-2. The officer only recalled that the defendant had one fifty-dollar bill and two twenty-dollar bills. *Id.* at *2. The defendant also gave a false name to the officers. *Id.* No identification was found in the room. *Id.* The police obtained a search warrant for the room and seized a digital scale, a marijuana grinder, a compressor for compressing drugs into small bricks, a "cutting agent" for drugs, a loaded nine-millimeter handgun, ten alprazolam pills, and thirty-nine packs of heroin. *Id.* The jury convicted both co-defendants of possessing heroin with intent to sell, possessing heroin with intent to deliver, two counts of possessing a firearm during the commission of a dangerous felony, and two counts of simple possession of alprazolam. *Id.* at *3.

This court concluded that the evidence was insufficient to establish that the defendant constructively possessed the drugs and handgun, noting that no contraband was found on the defendant's person and that $118 was "not a particularly large amount" of money. *Id.* at *9. This court discussed that no proof was presented relative to who rented the room or possessed a key, how long the defendant had been there or how long he intended to stay, or whether any of the clothes or bags inside the room were his. *Id.* This court noted that the co-defendant, in comparison, had more than $400 in cash. *Id.*

We think *Jones* is distinguishable from Defendant's case. Although Defendant also had no contraband on his person and an amount of cash on his person that was arguably not suspicious, the Crime Stoppers tip named Defendant by his nickname, which was known to the police, and described Defendant's physical features[11] as the person who was selling drugs out of Room 45. Officer McNeil testified at trial that he verified that Defendant was the renter of Room 45 and that he sought a search warrant because Defendant told him, "No, you can't search my room."

Defendant urges this court to conclude that, although the evidence may be sufficient to prove that he possessed Room 45, the evidence was insufficient to find that he possessed

---

[10] The record reflected that the co-defendant had an outstanding warrant and that the police received two tips that the co-defendant was at the motel and that he was possibly selling drugs there. *Id.* *4-5. However, the jury was not presented with this information.

[11] Although the trial transcript does not contain any discussion of Defendant's appearance, the presentence report reflects that Defendant was sixty-five years old, five feet, nine inches tall, and 190 pounds at the time of sentencing.

the controlled substances and weapons themselves. *See State v. Ross*, 49 S.W.3d 833, 846 (Tenn. 2001) (stating that "although a defendant's mere presence at a place where controlled substances are found will not support an inference of possession . . . a person in possession of the premises where controlled substances are found may also be presumed to possess the controlled substances themselves"). Defendant argues that, unlike the proof in *Ross*, the State did not establish that Defendant "rented the room in his name, paid for the room, or possessed a key to the room." Defendant also argues that he was not alone in the room, that Mr. Greenwood opened the door for the police, and that the police did not fingerprint or DNA test any items inside the room.

In *Ross*, the police went to a hotel room accompanied by the room's renter. *Id.* at 837. The defendant and three other people were inside. *Id.* The officers smelled marijuana and directed all the room's occupants to exit the room and empty their pockets. *Id.* They asked the defendant to remove his shoes, and a key to another room at the same hotel was inside his sock. *Id.* The defendant denied that the room was his. *Id.* A search of that room revealed a quantity of cocaine base, scales, and sandwich bags; in addition, police found defendant's name on a wallet, two car titles, and a recent receipt inside the room. *Id.* Later investigation reflected that the room was registered to the defendant and a second person and that the defendant paid for the room in cash. Our supreme court concluded that, although the room was registered to two people, the defendant's "possession of and residence in the motel room is strong evidence of his 'ability to reduce [the cocaine base] to actual possession,' . . . and consequently, we hold that the evidence is more than sufficient to establish the [defendant's] constructive possession[.]" *Id.* (internal citations omitted).

Although we agree that the proof of Defendant's residence in and having rented Room 45 could have been more robust,[12] the evidence of constructive possession was sufficient. In the light most favorable to the State, Officer McNeil testified that he verified that Defendant rented Room 45 and that Defendant referred to Room 45 as "my room." *See State v. Campbell*, No. M2020-01045-CCA-R3-CD, 2022 WL 872199, at *8 (Tenn. Crim. App. Mar. 24, 2022) (concluding that the evidence of actual or constructive possession of drugs was sufficient when the defendant claimed that a box containing drugs and drug paraphernalia, which was near his feet in a car floorboard, was his), *perm. app. denied* (Tenn. July 13, 2022). Relative to Defendant's ability and intent to exert control over the drugs and weapons in Room 45, Officer Wheeler testified that he heard Defendant bang what sounded like a plate against the table beside the air conditioning unit as the police stood at the open door. Some of the drugs recovered were found inside a box hidden

---

[12] We note that the jail inventory form exhibited to the suppression hearing reflected that Defendant had a hotel room key on his person at the time of his arrest. However, the jail inventory form was not introduced as evidence at trial, and there was no testimony concerning the key during the pretrial hearings or at trial.

in the air conditioning unit beside the seat Defendant occupied, which a reasonable factfinder could conclude circumstantially established that Defendant had actually possessed the box. *See id.* (concluding that the evidence of possession of a pistol and methamphetamine was sufficient when a pistol was found protruding from underneath the front passenger seat in which the defendant was sitting, and the methamphetamine was in a plastic bag tied around the front passenger seatbelt buckle). Moreover, more drugs and the weapons at issue were found in an unlocked lock box on or near the nightstand and in an unlocked floor safe—in short, they were placed around the room and accessible such that the trial court could reasonably find that the person in control of the room also had the ability and intent to exert control over the contraband inside. Defendant is not entitled to relief on this basis.

### III.     Consecutive Sentencing

Defendant contends that the trial court erred by imposing partial consecutive sentences, disputing the trial court's finding that Defendant had an extensive criminal history. The State responds that the court acted within its discretion in ordering partial consecutive sentences, that the court properly determined that Defendant has an extensive criminal history, and that the court also found that Defendant committed the instant offenses while on probation.

To facilitate meaningful appellate review of sentencing, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d at 682, 706 (Tenn. 2012). When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1)). In this case, the trial court detailed its findings on the record, and its decision is presumptively reasonable. *Id.*

The statutory factors governing the alignment of sentences for a defendant convicted of multiple offenses are codified at Tennessee Code Annotated section 40-35-115(b), which provides, in pertinent part:

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(2) The defendant is an offender whose record of criminal activity is extensive; [or]

. . . .

(6) The defendant is sentenced for an offense committed while on probation[.]

Tenn. Code Ann. § 40-35-115(b)(2), (6) (2022). Any one of the grounds set out in Tennessee Code Annotated section 40-35-115(b) is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

Our supreme court recently held that a trial court should consider the following non-exclusive factors when finding that a defendant has an extensive record of criminal activity:

(1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;

(2) The time span over which the criminal activity occurred;

(3) The frequency of criminal activity within that time span;

(4) The geographic span over which the criminal activity occurred;

(5) Multiplicity of victims of the criminal activity; and

(6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).

In this case, the May 2022 sentencing hearing occurred before our supreme court issued the *Perry* opinion. Relative to consecutive sentencing, the trial court noted that it "rarely [saw] lists this long of very serious offenses committed by [D]efendant" and, when discussing Defendant's criminal history generally, observed that it began thirty years ago.

Although, in light of *Perry,* trial courts going forward should provide more reasoning on the record than was present in this case, we disagree with Defendant's assertion that it was "unclear" how the trial court reached the conclusion that Defendant's record was extensive, as well as Defendant's argument that the court should have named each of the offenses it considered to be "very serious." Defendant's criminal record is such that it is obvious to which serious offenses the trial court referred—in addition to the felony offenses in this case, which involved not only selling multiple types of drugs but also possessing a firearm during the commission of a dangerous felony and as a convicted violent felon, Defendant's prior record consisted of two counts of aggravated burglary and one count each of aggravated rape and aggravated sexual battery, which were all committed in 1993 and 1994, as well as one misdemeanor assault conviction in 2019. We note that, in *Perry*, our supreme court stated that a finding of an extensive criminal history may be based solely upon the offenses for which the defendant is being sentenced. *Id.* at 131 ("[W]e clarify that a defendant need not have prior criminal convictions or activity to qualify as an offender whose record of criminal activity is extensive for purposes of section 40-35-115(b)(2)").

Nevertheless, Defendant has not disputed that he was on probation at the time of the offenses in this case. The record reflects that Defendant pleaded guilty to simple assault on January 4, 2019, and received a suspended sentence of eleven months and twenty-nine days. The offenses in this case were committed on December 20, 2019. The trial court specifically discussed that it was also ordering partial consecutive sentences based upon Defendant's committing the offenses while on probation.

Because the trial court properly found at least one applicable factor supporting consecutive sentencing, the court did not abuse its discretion in ordering partial consecutive sentences. *See Pollard*, 432 S.W.3d at 862. Defendant is not entitled to relief on this basis.

IV.    Merger of Counts 9 and 10

Although it has not been raised by the parties, the record reflects that the trial court erroneously merged Count 9, possession of a firearm during the commission of a dangerous felony, with Count 10, possession of a firearm by a convicted violent felon, to reflect one Class B felony conviction.

Our supreme court recently admonished this court to use caution when exercising plain error review for issues raised sua sponte, explaining that the "principle of party presentation is a defining feature of our adversarial justice system" and that the "judicial role is not to research or construct a litigant's case or arguments for him or her[.]" *State v. Bristol*, 654 S.W.3d 917, 924 (Tenn. 2022) (citations and internal quotation marks omitted). Our supreme court also emphasized that confining appellate review to those issues raised in the court below "promote[s] fairness, accuracy, and finality by 'ensur[ing]

that the [parties] are afforded an opportunity to develop fully their opposing positions on an issue[.]'" *Id.* at 925 (quoting *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018)). The *Bristol* court stated, though, that the plain error doctrine, as embodied in Rules 13(b) and 36(a), "afford[s] appellate courts discretion to consider issues that have not been properly presented in order to achieve fairness and justice." *Id.* at 927 (internal quotation marks and citations omitted). Appellate courts should "sparingly" exercise this discretion, and our supreme court has stressed that this court "must give the parties fair notice and an opportunity to be heard on the dispositive issues." *Id.* (internal quotation marks and citations omitted).

Keeping this guidance in mind, the record reflects that the State did not raise an objection to the merger in the trial court, although the prosecutor discussed at the sentencing hearing that her initial impression that Counts 9 and 10 should be merged was mistaken. The State's appellate brief contains a short description of the trial court proceedings relative to merger in a footnote but does not raise merger as an issue; accordingly, it has been waived. However, because the error was obvious and acknowledged at the sentencing hearing by the prosecutor, as well as by the trial court at the motion for new trial hearing, and the record is otherwise sufficient for this court to consider it, we ordered that the parties provide supplemental briefing regarding the merger issue.

In his supplemental brief, Defendant argues that the State abandoned the issue after the sentencing hearing and that our supreme court has previously declined to address merger in similar circumstances. *See State v. Berry*, 503 S.W.3d 360 n.2 (Tenn. 2015) (noting that because the State had raised no issue related to the trial court's merger of the defendant's aggravated assault and attempted second degree murder convictions, "we express no opinion regarding the substantive propriety of the merger").

Alternatively, Defendant argues that the plain error factors have not been met because no clear and unequivocal rule of law was violated. Defendant asserts that merger was proper because both Counts 9 and 10 required proof of an underlying felony, rendering dual convictions violative of Double Jeopardy principles. *See* Tenn. Code Ann. §§ 39-17-1324(g)(2) (providing that possession of a firearm during the commission of a dangerous felony is a Class D felony with a mandatory minimum five-year sentence if the defendant has a prior felony conviction); -1307(b)(2) (stating that unlawful possession of a firearm is a Class B felony if the defendant has a prior conviction for a felony crime of violence); -1301(3) (defining a crime of violence as an enumerated list of offenses, including aggravated rape, aggravated sexual battery, and aggravated burglary). Defendant notes that the State sought a five-year mandatory minimum sentence in Count 9, which required proof of a previous felony.

Defendant also asserts that the plain error doctrine was developed to protect the substantial constitutional rights of the criminally accused and that "nothing in the history of the plain error doctrine suggests that this rule was ever intended to provide an avenue for relief to the government in criminal cases[.]"

Defendant also argues that, should this court decide that plain error review is possible for claims raised by the State, waiver of the issue was tactical because the State abandoned the issue after obtaining its goal of a longer overall sentence on the Class B felony. Defendant further argues that, because the State has no constitutional rights, no substantial right was adversely affected. Finally, Defendant avers that consideration of this issue is not necessary to do substantial justice because Defendant was convicted of three Class B felonies and is serving a twenty-eight-year sentence.

The State responds that Tennessee Rule of Appellate Procedure 36(a) gives this court authority to consider any issue "that has affected the substantial rights of a party" when "necessary to do substantial justice." The State notes that the prosecutor addressed the merger issue at the sentencing hearing, although she did not request relief at the motion for new trial hearing, and that this court has previously concluded that the State is entitled to plain error relief in cases of improper merger.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *Hatcher*, 310 S.W.3d at 808. Moreover, Tennessee Rule of Appellate Procedure 13(b) states that appellate courts have the discretionary authority to consider issues not presented for review "to prevent injury to the interests of the public" and "to prevent prejudice to the judicial process."

Upon careful examination of the language of Rules 36(a) and 13(b) and how our supreme court and this court have applied plain error review to criminal cases, we cannot adopt Defendant's narrow interpretation of plain error review as only protecting the rights of defendants. Defendant correctly observes that Tennessee Rule of Criminal Procedure 52(b), which was later moved to Tennessee Rule of Appellate Procedure 36(b), referred only to the "substantial rights of the accused" and that our supreme court noted in *Minor* that the relocation did not "alter the parameters of the plain error doctrine." 546 S.W.3d at 66, n. 14.

However, even assuming for the sake of argument that Rule 36(b) does not convey an avenue for relief for the State, Defendant does not address that Tennessee Rule of Appellate Procedure 13(b) allows this court discretionary authority to reach issues not properly presented to prevent injury to the interests of the public and the judicial process. Our supreme court in *Bristol* discussed the tandem effect of Rules 13(b) and 36 as follows:

We have held that, together, Rules 13(b) and 36(a) afford appellate courts "discretion to consider issues that have not been properly presented in order to achieve fairness and justice." . . . . And Rule 36(b), which codified the common-law plain-error doctrine, allows an appellate court to "consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b); *see also Minor*, 546 S.W.3d at 65-66; *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010) (explaining that plain-error review under Rule 36(b) "is discretionary").

654 S.W.3d at 926-27. Likewise, this court has applied the same plain error analysis outlined in *Adkisson* and its progeny to defendants and the State; we note that our supreme court has denied permission to appeal in several of these cases. *See, e.g., State v. Dotson*, No. E2019-01614-CCA-R3-CD, 2021 WL 3161218, at *33 (Tenn. Crim. App. July 27, 2021) (remanding for merger of two counts of felony murder and the entry of separate judgments for aggravated child abuse and neglect, which were erroneously merged with the respective felony murder convictions, when merger was not raised by either party), *perm. app. denied* (Tenn. Dec. 9, 2021); *State v. Durham*, No. W2016-02194-CCA-R3-CD, 2017 WL 6406038, at *7 (Tenn. Crim. App. Dec. 14, 2017) (concluding that a trial court's sua sponte merger of sexual battery and attempted rape convictions was plain error when the State did not object at trial but requested plain error review on appeal), *no perm. app. filed*; *State v. Downey*, No. M2013-01099-CCA-R3-CD, 2014 WL 820274, at *10 (Tenn. Crim. App. Feb. 28, 2014) (remanding for the entry of separate judgments of conviction for first degree felony murder and aggravated burglary when the State requested plain error review on appeal), *perm. app. denied* (Tenn. June 25, 2014); *State v. Breezee*, No. W2011-01231-CCA-R3-CD, 2012 WL 6728345, at *8 (Tenn. Crim. App. Dec. 28, 2012) (remanding for the entry of separate judgments of conviction for rape and incest when the State requested plain error review on appeal), *perm. app. denied* (Tenn. May 14, 2013).

Similarly, Defendant's argument that plain error relief can never be granted to the State because the State itself has no constitutional rights is unavailing. Erroneous merger of convictions clearly results in prejudice to the judicial process and the interests of the public, and as such, we choose to address it pursuant to Rule 13(b).

As stated above, plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642. In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the complaining party must have been adversely affected; (4) the complaining party did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 640-41; *see also Smith*, 24 S.W.3d at 282-83 (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief).

First, the record clearly establishes what occurred in the trial court. At the conclusion of the proof at trial, the prosecutor noted her belief that Counts 9 and 10 needed to merge because the two charges were alternative theories of guilt for Defendant's possessing one gun. The prosecutor requested that the court merge the convictions such that one Class B felony conviction remained. The trial court, in announcing its verdict, merged Count 9 into Count 10.

At the sentencing hearing, the prosecutor corrected her earlier statement and said that, based upon her research, the convictions should not merge. The trial court stated that it "[took] responsibility" for the merger issue and that it "was something [the court] want[ed] the opportunity to correct at the motion for new trial stage rather than letting this thing get up before we fix it, if it's something that's got to be fixed." At the motion for new trial hearing, the trial court made the following statement:

> In retrospect, I probably made a mistake in merging [C]ounts 9 and 10, rather than keeping them as separate convictions. The State has not asked for any relief at this level, and so I stand by the determination that I made on that. Those counts will remain merged. The court won't make that mistake again in the future, hopefully.

Second, a clear and unequivocal rule of law was breached. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

With respect to the third category, the double jeopardy prohibition operates to prevent prosecutors and courts from imposing punishment that exceeds that authorized by the legislature. *Id.* at 542. Such single prosecution, multiple punishment claims ordinarily fall into one of two categories: (1) "unit-of-prosecution" or (2) "multiple description" claims. *Id.* at 543. Multiple description claims arise in cases where the defendant has been convicted of multiple criminal offenses under different statutes but alleges that the statutes punish the same offense. *Id.* at 544.

When reviewing multiple description cases, courts must determine whether the defendant committed two offenses or only one. *Id.* at 544. To do so, courts apply the test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932). *Blockburger*, 284 U.S. at 304; *Watkins*, 362 S.W.3d at 544. The reviewing court should first determine whether the Tennessee General Assembly expressed an intent to permit or preclude multiple punishments. *Watkins*, 362 S.W.3d at 556. "Where the General Assembly's intent is not clearly expressed, the *Blockburger* test should be applied to determine whether multiple convictions under different statutes punish the 'same offense.'" *Id.* To make this determination, appellate courts must "examin[e] statutory elements of the offenses in the abstract, rather than the particular facts of the case." *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012). A *Blockburger* analysis requires two steps: (1) determine whether the statutory violations arose "from the same act or transaction" and (2) if they did arise from the same act or transaction, determine whether the offenses for which the defendant was convicted constitute the same offense by comparing the elements of the offenses for which the defendant was convicted. *Id.* at 545. If each offense contains an element that the other does not, the statutes are treated as distinct, and courts presume that the legislature intended that the offenses be punished separately. *Id.* at 545-46. Whether multiple convictions violate the principles of double jeopardy is a mixed question of law and fact that appellate courts review de novo with no presumption of correctness. *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014).

Applying the *Blockburger* analysis to Counts 9 and 10, we conclude that the statutory violations arise from the same criminal act. *See Watkins*, 362 S.W.3d at 545. Defendant's convictions in Counts 9 and 10 are based on Defendant's possession of one handgun during a continuous transaction of criminal activity. Accordingly, we must determine whether the offenses for which the Defendant was convicted constitute the same offense based on an analysis of the elements.

As charged in Count 9, "It is an offense to possess a firearm . . . with the intent to go armed during the commission of . . . a dangerous felony." Tenn. Code Ann. § 39-17-1324(a) (2019). "A felony involving the . . . possession with intent to sell . . . a controlled substance" is an enumerated dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(L). As charged in Count 10, "[a] person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence[,]" based on Defendant's 1993 and 1994 convictions for aggravated rape, aggravated burglary, and aggravated sexual battery. Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2019).

In this case, Count 9 required proof that the possession occurred during the commission of an underlying dangerous felony, and Count 10 required proof that Defendant had a prior conviction for a felony crime of violence. Thus, we conclude that each offense has an element that the other does not and that Defendant's convictions in Counts 9 and 10 should not have been merged. We have reached this conclusion in other

cases as well. *See State v. Gray*, No. W2017-01897-CCA-R3-CD, 2018 WL 4382093, at *9 (Tenn. Crim. App. Sept. 14, 2018), *no perm. app. filed*; *State v. Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at *14-15 (Tenn. Crim. App. Aug. 6, 2013), *no perm. app. filed*.

Relative to the remaining plain error factors, erroneous merger affects the interest of the State and the people in ensuring that Defendant is held accountable for each of his crimes. *See Downey*, 2014 WL 820274, at *10. The State did not waive the issue for tactical reasons, and the prosecutor attempted to correct her mistake at the sentencing hearing, although she did not raise a formal objection to the merger. Finally, the erroneous merger "deprives the State of the benefit of the [factfinder's] verdict," and consideration of the error is necessary to do substantial justice. *See id.*

Having concluded that the factors for plain error relief have been satisfied, we remand Defendant's case to the trial court for sentencing on Count 9 and the entry of corrected judgments removing the references to merger. We note that the sentence in Count 9 has a five-year mandatory minimum, because Defendant has prior felony convictions, and mandatory consecutive sentencing with the underlying dangerous felony.[13] *See* Tenn. Code Ann. § 39-17-1324(e)(1), (g)(2). The trial court may conduct a resentencing hearing, in its discretion, and should enter an order articulating its reasoning relative to the length of the sentence in Count 9.

## V.    Clerical error

Our review of the record reflects that the judgment in Count 3 shows Tennessee Code Annotated section 39-17-417 as the statute for the conviction offense. On remand, the trial court should enter a corrected judgment to show Tennessee Code Annotated section 39-17-418 as the statute for the conviction offense of simple possession of Xanax.

---

[13] We note that the indictment in Count 9 alleged four underlying dangerous felonies, corresponding to Count 1 (possession of more than 0.5 grams of cocaine with the intent to sell or deliver), Count 2 (possession of more than 0.5 grams of methamphetamine with the intent to sell or deliver), Count 4 (possession of methadone with the intent to sell or deliver), and Count 7 (possession of hydrocodone with the intent to sell or deliver). Counts 4 and 7 were dismissed, and the State did not make an election between Counts 1 and 2 for purposes of Count 9. Because this was a bench trial, there are no election issues relative to unanimity, and both counts are Class B felonies with identical sixteen-year sentences. On remand, the trial court should choose one underlying dangerous felony to which the sentence in Count 9 must run consecutively.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed, and the case is remanded for further proceedings consistent with this opinion.

_____
ROBERT L. HOLLOWAY, JR., JUDGE